All right. May it please the Court, my name is Daniel Osborne. On behalf of the appellant, Michael Hendrix, I'd like to reserve three minutes for rebuttal, please. Defendant Novartis contends that as of September 18, 2003, nobody knew that Zometa, a prescription drug manufactured by Novartis, caused a condition known as osteonecrosis of the jaw or dead jawbone. Novartis contends that the Food and Drug Administration didn't know, the medical community didn't know, no scientists or researchers knew, and as we know from their deposition testimony, none of Mr. Hendrix's doctors apparently knew of some causal association. But why didn't the discontinuation of Mr. Hendrix's treatment with Zometa in October 2003 place them on notice that Zometa might have caused the injury? Your Honor, what Novartis has done in its position here and what the district court accepted was that a handful of either references to a doctor's note or a chart or a letter from one doctor to another, and there were only three or four of them between September of 2003 and December of 2003, they sort of cobbled those things together to sort of create either an actual notice or a constructive notice argument, which the district court accepted. All Dr. Barstas did in discontinuing the Zometa was sort of take a guess at what was causing Mr. Hendrix's jaw problem. Is taking a guess the same as expressing a medical opinion? I hope not. Well, what's the difference in this case? It's in his notes, isn't it? Well, he says, well, I'm guessing that. Is that what he says in his notes? The guess is from, if I can keep the doctor straight, it was Dr. Barstas, he didn't say I'm guessing, but he didn't know what was actually causing Mr. Hendrix's problems and simply taking him off the drug. Nobody expressed an opinion which, why isn't that sufficient for notice? I don't believe he did express an opinion, Your Honor, that none of these doctors expressed an opinion that the drug caused the disease. And the clear evidence of that is, let's go back to the first motion for summary judgment that Novartis filed in 2011. The objective of that motion for summary judgment was to get out of this case on a proximate cause ground argument. And so what Novartis did was they deposed Drs. Barstas, Berenson, and Salaita. And, of course, because they were seeking to establish lack of proximate cause, the questioning elicited answers from these three doctors that they didn't know what was causing Mr. Hendrix's jaw problems. In fact, if you go back to their statement from their original summary judgment motion, they put in their papers, and I'm quoting, Drs. Barstas, Powell, and Berenson did not even diagnose Mr. Hendrix with ONJ, let alone determine its cause. That's what they put in a brief in 2011. Well, what are you saying? A diagnosis has to be definitive in order to give notice? No, it doesn't. There can be something less than a definitive diagnosis. My point is that back in 2011, they got these three doctors to say, we don't know very much about ONJ, we don't know very much about this condition, we certainly didn't know that this drug, Zometa, could cause this condition. Then what they do... Well, in October 2003, I think the orthopedist that saw Hendrix after he'd been seen by Dr. Felsenfeld, the orthopedist said it is believed that Hendrix's Zometa treatments were discontinued because it had caused his ONJ. And then Felsenfeld said in September 2003 that in the treatment notes that Hendrix had remarked, in his treatment notes that Hendrix had bisphosphonate osteonecrosis of the jaw ONJ. So, I mean, they're talking about it all through here. It's not as pervasive as the defendant makes it sound. And, in fact... Did I make up anything there? When you're talking about the orthopedist, you're referring to Dr. Blaze? The orthopedist... I think what we have, though... I'm sorry, Your Honor. ...was in September of 2003. That was Dr. Felsenfeld, I think. No, Felsenfeld, I thought, was the maxillofacial surgeon that saw him in September 2003. October 2003, the oncologist stopped the Zometa treatment, and then Hendrix saw an orthopedist a month after that that said it's believed... Well, the orthopedist didn't conduct any sort of examination. All the orthopedist was doing was conveying information that had been conveyed to him in a report. And there's also no evidence that the orthopedist had any conversation with Mr. Hendrix about a potential causal association between the drug and the disease. Well, his wife remembered certain things, I guess, right? The wife really remembered what her husband had told her, I believe. There's a real disconnect with what was discussed among the doctors and what may have been conveyed to Mr. Hendrix by those doctors. And, in fact, when we look at, again, the doctor's testimony, what they shared with Mr. Hendrix, Dr. Berenson testified that he didn't essentially share anything about his view on this issue with Mr. Hendrix. Dr. Barstas did say he had a discussion about stopping Zometa, but we don't know what went beyond that. So he had to file before, let's see, the trigger date was, was it 2004? We need about four months, Your Honor. So is there anything in the record explaining why he filed in 2006, January 2006? Well, that would have been about two and a half years later, following this consultation with Dr. Felsenfeld. He actually suffered a fractured jaw in June of 2004. And you have to remember, he suffered from jaw problems from 2002, and trying to figure it out, that's how he finally ended up in front of Dr. Felsenfeld. And that's in September of 2003. About eight or nine months later, the jaw fractures. He's continuing to have problems. But you have to remember, as far as the medical and scientific community was concerned in 2003, this condition, nobody knew about it. Nobody knew it existed. Nobody knew what the problem was. So what does the record show that you knew in January of 2006? January of 2006. When you filed? I don't know, Your Honor, but I can tell you that by January 2006, some lawsuits had been filed. 2005 was when the first lawsuits were filed in the country related to this condition. How many of these cases do you have? Well, they've been for the most part. And just you, your office? We had approximately 400, Your Honor. You got 400? Yes. How does one happen to slip through that? Well, we don't think it did, Your Honor. We think we filed them plenty of times. Well, you know, how about your others? I'm sorry, what? Your other four, 399. You having a problem on that? Did you file any of the 400 cases before this date? January of 2006 would have been the beginning of the time we started filing cases. We didn't get involved in these cases until late 2005. This file would have then come to us and we would have filed the complaint. Well, how did you get this case? We had a referral counsel based in Los Angeles who sent us most of these cases. But actually, the file didn't come to me initially. It came to my referring counsel and then was moved to my office. So it started here in L.A. and then was referred to your office? And then there was an application. And then it went down to Tennessee? For the multidistrict litigation, yes, Your Honor. Multidistrict litigation. And then it went where? Well, then it was kind of parked in the multidistrict litigation for a number of years because certain cases were selected for trial workup, a certain number of trials occurred, and eventually the case got remanded in 2013 to the Central District of California and Judge Fitzgerald. So these cases are tried separately? Yes. Each one? Correct. And now, are there questions of fact, are there not, as to when the plaintiff was put on suspicion to conduct a reasonable investigation? And that's when the time period would start to run. Correct. And is there conflicting evidence? Well, yes, Your Honor. On that question? Yes. And, in fact, when you focus on the doctor's testimony versus what's in the doctor's charts, what Novartis has tried to do is cobble together some notice argument based on information in the charts of the records. And there's only a couple little references among all those four doctors between September and December of 2003. If you look at the testimony, these people were deposed, again, because Novartis wanted to get them to say there's no causal association. Their testimony is quite concise, and it definitely creates a tribal issue, or at least the issue of knowledge of the statute of limitations is something that's ordinarily reserved for the jury. But in their testimony, Dr. Berenson acknowledges he said, and this is in the record, Dr. Berenson was deposed. So your argument is that this question is a conflict on that and the evidence and that it's an issue that the jury ought to decide. Absolutely. Dr. Berenson says that as of 2009, he said, yeah, I know a lot today. As of 2003, he says, I had no clue. That's his exact words. Dr. Barstis said, excuse me. Are you sure? How many days? About four months, Your Honor. Four months. About four months. In any event, Dr. Barstis says that he thought. But the other cases are okay. The other 399. Well, there's actually been a global resolution of all but four of the cases, and this is one of the four. On the statute. I suspect that during the course of the multi-district litigation, we had some small number of cases dismissed for statute problems. I just argued a statute issue in front of Judge Keenan on one of these cases a couple of weeks ago because our client had the condition in 2000, didn't file a lawsuit until 2009. Where's Judge Keenan? In the Southern District of New York. He's not in Boston? No. Wasn't Eric Keenan up in Boston? John Fitzgerald Keenan in the Southern District. But if you just look at what the two other doctors said in their deposition testimony, they also confirmed that they didn't know anything about this drug and this disease back in 2003. One of them says, I thought it might have been Prentizone or this drug. But frankly, my educated guess is that it was the Prentizone, not the Zometa. So if you look at the testimony, the deposition testimony of the physicians, you can compare it to the records of these physicians. You have competing inferences. And it's inconceivable to me that Judge Fitzgerald could conclude as a matter of law that the only conclusion a jury could reach or that a judge could reach when considering all of the facts and all of the evidence was that Mr. Hendricks was on notice as of September 18th. I don't see how you could reach only that one conclusion. What I would add to that is even if you assume he's on inquiry notice, we argue in our brief, I think, fairly comprehensively that a reasonable investigation would not have uncovered grounds that would have led, you know, would have given Mr. Hendricks a factual basis to file a complaint. We say that if he had gone to the company itself back in September 2003, the company issued a statement in the Journal of Oral and Maxillofacial Surgery. Because there had been some noise about some case reports, the company came out with a public statement that said, we're not aware of any connection between the drug Zometa and this condition, osteonecrosis. So if he had called the company, Mr. Hendricks would have run into a brick wall there. So what date was that? Well, if you if you go to the September, October, November 2003 time frame, if Mr. Hendricks had made that inquiry around that time after the consultation. That was still the company's position. Pardon? I say it was at that time was still the company's position that they had no knowledge of any, say, I'll say, causal relationship. Yes. And that was before any cases were filed. Once the litigation, of course, was filed, they obviously took the same position. They had an expert that they flew in from England who testified in almost every one of the trials. In his reports, in his deposition testimony and in his trial testimony, he said there is no causal association. So they still took that position. But I mean, inquiry notice can't mean that if the company denies it, that you're still not on inquiry notice. I mean, a lot of defendants deny what they do till their dying day. Correct. That's only one of the factors we put in. It doesn't mean he's not an inquiry notice. It means if he had conducted a reasonable investigation, what would he have found? Nothing from the company directly. The label, there was nothing on the Zometa label until really effectively March 2004. But you filed cases before the companies admitted it because they're still not admitting it, right? Correct. And that's what I'm saying. We had four facts that we pointed to in our brief that support our position that a reasonable investigation would not have yielded a factual basis for filing a complaint. That's only one of them. The other two or the other three are the label, contacting the company itself, and I'm forgetting. But the company's denial, even through litigation, we acknowledge that that's not, you know, certainly a company doesn't have to admit responsibility before the clock can start to run. So, again, even if Mr. Hendricks was on inquiry notice, a reasonable investigation would not have turned up. What were the disputed factual issues? Causation, approximate cause. The company takes the position that the drug does not cause the disease. I mean, on the issue of the statute and when the client was put on notice. I think it can be distilled down to the doctors, the evidence relating to the doctors and their records and their testimony. You know, the dispute as to when the doctors knew what they shared with Mr. Hendricks, again, we point out in our brief that there's really no evidence that much of this, if any, was shared with Mr. Hendricks by all of the doctors. So maybe they were talking amongst themselves, but what did they tell Mr. Hendricks? And we know that Felsenfeld mentioned it to him and maybe Dr. Barses, but there's really a lack of any testimony or evidence supporting that information was shared with Mr. Hendricks that would put him on notice. All right. Thank you. Thank you. Good morning. Good morning. May it please the Court, Phil Bussman on behalf of defendant Apelli Novartis Pharmaceuticals Corporation. If I may, I'd like to start out by setting forth that it is the plaintiff's burden on the issue of the discovery rule. And even today at this hearing, not to mention through two rounds of briefing, the plaintiff has never indicated what put him on notice when he actually did file the lawsuit. And, in fact, there are at least three pieces, if not more, of uncontroverted evidence that plaintiffs have not addressed that proves he was on actual notice, even as of September of 2003, starting with the record at page 111. And when I said what's in the record that shows why you filed the lawsuit, what you're saying is they've never said when they actually were on notice? Never. Not once. Never. There's no evidence at all. And, in fact, if you turn to the excerpt of the record at page 111, there is a letter from Dr. Felsenfeld to Mr. Hendricks' entire medical team that includes Dr. Salaita, Dr. Barstas, Dr. Berenson, and it states in quote on the second line. And what's the date on that? This is from June 18, 2004. As you know, I initially saw Mr. Hendricks in September 2003 and made a working diagnosis of bisphosphonate osteonecrosis. He was counseled on my findings. Plaintiff makes a lot of the fact that Dr. Felsenfeld wasn't deposed, but he wrote a letter indicating that he told Mr. Hendricks what his diagnosis was as of that date. Mr. Hendricks also doesn't account for the testimony of his own wife. He makes the proposition that perhaps Mrs. Hendricks had a conversation with Dr. Barstas regarding stopping the Zometa therapy in October 2003, and perhaps Mr. Hendricks wasn't even part of that conversation. Well, if you look at the record at document number 106-3, page 361 of 368, that's Mrs. Hendricks' testimony. They've never addressed this positive portion. Question, was anyone else present while that discussion with Dr. Barstas was going on other than you, your husband, and Dr. Barstas? I don't think so. What did the doctor say? The doctor testified. What did he say? What did he say to the patient? Dr. Barstas explained in his testimony that he had had conversations with Dr. Felsenfeld and with Dr. Berenson. Now, Bob, what he said in his deposition of questions, what did he tell the couple? Oh, that he was stopped. What did he tell the patient? He told the patient that he was ceasing the Zometa because of its connection with his osteoarthrosis of the jaw. That's not disputed. Because of the connection doesn't mean causal connection. Absolutely, yes. But you say that's enough for inquiry notice? That's enough for actual notice based on Mrs. Hendricks' testimony. Is it correct at this time it was still Novartis' position that they had no knowledge of any causal relationship? Well, first of all, the label that was in effect as of Mr. Felsenfeld's first visit with Mr. Hendricks didn't mention this condition. Did not or did? Did not. I take a lot of pills, you know, and that's what you get these days. And I've been on some pills and the doctors say, well, you know, I think I'm going to take you off of this because I don't think they're doing any good. They might cause you some harm. And I've had some patients that they have caused harm to. So we'll just take you off of that and I'll give you something else. Okay. So is that supposed to tell me that I may get this big problem here that he's talking about and I have no idea what he's talking about? And I'm not that anxious to hear about all this. So he's taking me off one and putting me on another. It doesn't say, you know, if you keep taking that, you know, you're going to have some really bad consequences. The whole thing, you know, with the pills today and what they do and how they interact, you know, you've got to have somebody look at all these different medications so they don't interact with one another and cause adverse problems, huh? Some people are more sensitive than others. I mean, you're talking to a layperson. Say to him, you know, this is bad stuff and this is going to cause you some real problems. So I'm telling you that. You've been taking it. We're getting you off of it. I don't want you to suffer any adverse consequences. Then he'd know. Then he'd know there's something wrong with this pill. I have a question, though, if you're talking about future adverse consequences. Can you answer that question for me? Well, if I can put it in context, this was not a pill. This was an indispensable. I'm just talking generally. What did he say to this patient? He told this patient that he had had three or four other patients with the same condition, that he had just come back from a meeting of the American Association of Oral and Maxillofacial Surgeons where there was an entire presentation on this issue, and he sat in because he knew the speakers on that issue. He then wrote a letter in September of 2003. But wait, he already had the condition, right? Yes. So it's not a situation where you're warning someone this could happen. Oh, yes. He already had the condition. Correct. As a matter of fact, there is no dispute that the condition occurred in 2002 and that Mr. Hendricks had gone to two other treating doctors to try to figure out what was causing it. Well, I just asked you what that doctor said to him. He told Mr. Hendricks that he had diagnosed other patients with this condition and explained to him the link between the condition and the drug. Then Mr. Hendricks was informed that Dr. Felsenfeld put his entire medical team into a different course of action. Dr. Felsenfeld instructed Mr. Hendricks' other oral surgeon not to perform any other invasive therapies on Mr. Hendricks. He also had conversations with the oncology team about withholding the Zometa therapy. This was not something that was cavalierly discussed. Mr. Hendricks' entire medical team was on notice and in full discussion on this issue in the fall of 2003. And the fact of the matter is that Mr. Hendricks was fully aware of this. It's undisputed in the record, when you referenced, Your Honor, Dr. Blose, that the communication in the record of Dr. Blose was based on Mr. Hendricks' own statement to Dr. Blose. If you turn to the record, document 126, page 40 of 48, you will find plaintiff's response to Novartis' statements of uncontroverted fact. It is undisputed by the plaintiff that, quote, Based upon her discussion with Mr. Hendricks, Dr. Blose noted, That was Mr. Hendricks telling Dr. Blose that. Based on his conversations with Dr. Felsenfeld, Dr. Berenson, Dr. Barstas, there was no mystery about this. Mr. Hendricks admitted it at his deposition. Now, plaintiff has asked for you to disregard the record testimony of his own plaintiff, which should put an end to this issue. But even if you do, they have yet to account for Dr. Felsenfeld's letter saying he informed him, his own wife's testimony that he was present in a discussion. Well, is there a difference in the hypothetical, though? Let's just say he was taken to Zometa, but he didn't have this condition, right? But then the condition happened after, like in 2004 or 2005. Then he would be within the statute of limits. He would be okay, right? That's correct. But he had the condition back then. And so it wasn't a question of warning about what could happen in the future. It was like talking about what you're going through right then. That's precisely the point. He was given an actual diagnosis that he was suffering from an adverse effect at that time in September of 2003 and repeated continuously throughout the medical records of his entire cancer and oral treatment team. Well, what about the situation, and I think that Counsel for the Appellant was talking about, a lot of times there's a situation of you can suspect something, but it's not really been scientifically established. The science has gotten clearer on things like, I don't know, Fosamax, Zometa, all of the things at this point, but is there a point where even when someone says, okay, I'm looking at everything that you're doing, and I think that it's a meta, but the scientific body of knowledge isn't completely, you know, it's developing, does that make a difference on whether he's on inquiry notice, if his doctor is more equivocal about it? Not in this case, Your Honor. Specifically because the- But it could in some cases. Theoretically, it could. But if I could clarify in this case, once he was put on actual notice or inquiry notice, he had two years to marshal his evidence to file a complaint. This specific issue was addressed in the Jolly case at pages 108 through 111, where the Jolly court aptly noted that a defendant's denial, even to the present, that their DES could have caused any adverse effects, as Your Honor aptly noted, doesn't affect the question of notice. Now, with respect to specific evidence in the record that would bear on the issue of notice, in addition to his doctor's diagnosis and action plan, you have a Novartis label change discussing this issue that occurred in September of 2003. Yeah, but let me ask you this. When his doctors told him about the problems, did they tell him that your condition is a result of this drug that you've been taking, that Novartis produces? Did they say it? They said, no, you've got a condition, and Novartis has aggravated or brought it on. Did they do anything like that? He was given an actual diagnosis that said that this drug was causing this problem, and it was recorded in a September 2003 letter. The operative language reads, Offered by who? Dr. Felsenfeld. So the doctor told him that. The doctor communicated this to him orally and then recorded it in writing to the rest of his treatment team, providing further information that he also discussed with the patient. And he said, and I quote, The doctor wasn't trying to sort of cover up his own conduct in this. Oh, no, Your Honor. A lot of times they do that. I understand your point. Everybody's trying to cover their butt here, you know. And so what's the problem with having a jury decide this, whether a reasonable person would be put on notice that this medication caused this? Because at this time, Your Honor, there is still no evidence to indicate when, if at all, plaintiff's claim actually accrued according to the plaintiff, and discovery is over. This is the summary judgment evidence. To this day, Mr. Hendricks has not indicated when it was that he put this information together in his head, despite the uncontroverted record evidence, and nothing has changed. There is still, according to plaintiff's own admission here at oral argument, that Novartis still denies causation, notwithstanding that it changed its label. Nothing changed. They could have filed the complaint back then, and in fact, there was a class action complaint filed in this litigation, as plaintiff admits, in 2005, which would have been within the limitations period for Mr. Hendricks. Others were able to file their claims. He's given no evidence whatsoever that would allow any jury to determine when his claim actually accrued, as Judge Fitzgerald noted. Well, maybe the lawyers that were capping this case were a little soul-finding him. Well, as the Jolly Court also notes, there are public policy considerations in a statute of limitations, and that a decision to allow a case to be tried by a jury does not trump the California legislature's decision to place a two-year statute of limitations on these claims. Well, there's an overriding policy that cases ought to be decided on the merits. And the California legislature could pass a statute next time they're in session that extends the statute here if they wanted to. Which they have, Your Honor. What? It used to be one year. Oh, that was it. One year was a real whatever it was. It was never long enough, and so they made it two years. It took a long time. With the lobbyists and all that, you get that extra year. That's pretty good. Well, Your Honors, I see that my time is up. And if there are no further questions, I'd simply ask that the Court affirm Judge Fitzgerald's reasoned opinion, granting Navarro a summary judgment on this issue. Thank you. Thank you. Did you drop the ball here? You. No. I'll give you your Miranda rights. No, Your Honor. I'm not concerned about a malpractice action. It's not on my shoulders. Mr. Osborne, do you have a position on when the plaintiff actually discovered or not? Your Honor, at this juncture, all we have to do is. . . I didn't ask you what you have to. . . Do you have a position on when the plaintiff discovered, had enough facts to make the discovery? I'll go with June of 2004 when his jaw fractured. You asked about, Judge Tashima, you asked what Dr. Barstas said to Mr. Hendricks. We have no idea what Dr. Barstas said. I don't know when counsel was explaining to you what the conversation was that took place between those two. I don't know where that is in the record. What do you mean by we have no idea? You have his deposition, don't you? Yes, and at his deposition, Dr. Barstas said. . . Well, based on my discussion with Dr. Felsenfeld, not Mr. Hendricks, that right away that he became my resource for this. So Mr. Hendricks had seen Dr. Felsenfeld, so he knew what I know. Why don't you speak slower? I'm sorry. I'm watching the clock tick away. No, don't watch the clock. Okay. You're already in overtime and we're letting you talk, so you're four minutes over. Thank you. Question. Okay. Do you remember having any discussions with Mr. Hendricks about this potential correlation between the drug and the disease? Answer. I don't have an independent recollection of that. So that's what he said at his deposition. Furthermore, this condition that Novartis's counsel says that Mr. Hendricks had in 2003, he had some condition. It didn't have an identity at that point in time. It wasn't until 2006 or into 2007 that the American Association of Oral and Maxillofacial Surgeons identified this thing. They felt that there had been enough information collected that they could sort of put a label on it, but even in the position paper that they issued in 2006, they hedged a little bit. So we think this is what this is. So in 2003, Mr. Hendricks had exposed bone that he'd had for about 18 months in his jaw that he could not clear up and that none of his doctors could clear up. The idea that these guys diagnosed him, definitively diagnosed him with this condition in 2003, in the fall of 2003 when the medical team was dispatched, is not found anywhere in the record. I will just quote you the testimony from Barstas, Berenson, and Salaita about what they said in 2003 to Mr. Hendricks. With respect to the September 24th visit, Novartis has stated in its brief that Mr. Hendricks and Dr. Salaita discussed the issue of Zometa having been the cause. At his deposition, Dr. Salaita could not recall any details of such discussion and testified only that, I think I did have some discussion with him to that effect. That's it. There's no further explanation about what they might have discussed. So clearly you've got competing inferences that could be drawn from that. With respect to the October 14th visit with Dr. Salaita, Dr. Barstas, I just read that where Dr. Barstas says he doesn't recall having an independent, he doesn't have an independent recollection of a conversation. Is he saying I don't have an independent recollection but it's in my notes? I mean it's like a police officer's that says, you know, this is my police report. I did it after the incident happened. It was true and correct at the time. I don't remember it now. Is that what he was saying? He didn't have an independent recollection of something that he wrote down that he did honor about the time that it occurred? I can't answer your question, Judge, but what I think is interesting is this questioning wasn't from me or my colleagues on the plaintiff's side. This was defendants' questioning of the doctor because they wanted the doctor at this point in time back in 2011 to testify that they didn't know about a causal connection between the drug and the disease. So I don't know, I imagine that if there was something else in the record that was better for them, they would have used that but they wanted these guys to admit, hey, we didn't know anything and that's the deposition testimony they got. Now today all of a sudden in the second motion for summary judgment we have definitive diagnoses. The reason they want that testimony now or they want the record to read that way is so they can make the statute of limitations argument. That wasn't in their first motion for summary judgment. They wanted these guys to be portrayed as ignorant on the subject of drug and disease until they decided to make the motion for summary judgment on statute of limitations. And I would just also, just so the record's clear, we did appeal also the denial of our motion to amend to add punitive damages. We don't believe there was any prejudice and Judge Fitzgerald had denied that motion. Thank you, Your Honors.
judges: Pregerson, Tashima, Callahan